IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

MARLON MAURICE ELLIS,          )
                               )
          Plaintiff,           )
                               )
     v.                        )          CV 117-091
                               )
DONNA YOUNG and JUDY HAMILTON, )
                               )
          Defendants.          )
_____

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
_____

Plaintiff, currently incarcerated at Augusta State Medical Prison ("ASMP") in Grovetown, Georgia, is proceeding *pro se* in this case filed pursuant to 42 U.S.C. § 1983. Plaintiff alleges Defendants have been deliberately indifferent to his mental health needs by not designating him a Mental Health level three inmate. (See doc. no. 1.) For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** Plaintiff's motion for summary judgment be **DENIED**, (doc. no. 55), his motion for judgment on the pleadings be **DENIED AS MOOT**, (doc. no. 64), Defendants' motion for summary judgment be **GRANTED**, (doc. no. 57), a final judgment be **ENTERED** in favor of Defendants, and this civil action be **CLOSED**.

## I.     FACTS

### A.     Allegations Contained in Plaintiff's Declarations

Plaintiff submitted several declarations in support of his claim Defendants were

deliberately indifferent to his serious medical needs by decreasing his Mental Health ("MH")
level from three to two despite his depression and suicidal ideations.  Plaintiff poses a threat
to himself because he is at a serious risk of committing suicide.  (Doc. no. 27, p. 1.)  In 2015,
Ms. Hamilton decreased Plaintiff's MH level from three to two despite the risk of Plaintiff
committing suicide based on past attempts.  (Id.; doc. no. 35, pp. 2-3.)  Ms. Hamilton told
Plaintiff to sign the agreement to decrease his MH level because he only suffers from
depression and his level was going to be dropped anyway.  (Doc. no. 35, pp. 2-3.)  Ms.
Young refuses to increase Plaintiff's MH level back to three despite knowing of the risk
Plaintiff poses to himself.  (Doc. no. 27, p. 1-2; doc. no. 35, p. 3.)  Plaintiff's symptoms
satisfy the requirements for MH level three.  (Doc. no. 39, p. 1.)  In 2015, Plaintiff wrote
letters in a journal to mental health counselors indicating he wants officers to kill him, but
the prison refuses to give him copies because he is indigent.  (Doc. no. 35, p. 2.)

Plaintiff overdoses every few weeks because he battles with depression and cannot
cope with his life sentence.  (Doc. no. 34, p. 2.)  On August 30, 2016, Plaintiff attempted
suicide by taking six Seroquel.  (Doc. no. 50, p. 3.)  On September 22, 2016, Plaintiff told
medical staff he attempted to kill himself by taking twenty Seroquel because he cannot cope
with his life sentence.  (Id. at 1-2, 4.)  The physician's assistant informed Plaintiff they would
hold him for observation.  (Id. at 1.)  Plaintiff informed the physician's assistant he was not
trying to kill himself and refused medical treatment because they would not place him in the
crisis stabilization unit ("CSU").  (Id. at 1-2, 4.)  In 2016, Plaintiff cut his "main vein artery."
(Doc. no. 51, p. 2.)  Plaintiff received three staples for the wound and was released to his

2

dorm instead of CSU.  (Id.)

On August 4, 2017, Plaintiff wrote Ms. Young and informed her he would commit suicide or have someone kill him.  (Doc. no. 7, p. 1.)  On August 13, 2017, Plaintiff tried to kill himself and was denied appropriate housing by being left in general population, where he is a danger to himself.  (Doc. no. 14, p. 1.)  Ms. Young is responsible for ensuring inmates are appropriately housed but has failed to assign him to appropriate housing.  (Id. at 2.)  On December 8, 2017, Plaintiff attempted suicide by hanging and was admitted to CSU.  (Doc. nos. 39, p. 1; 51, p. 2.)  In February 2018, Plaintiff threatened to attempt to overdose on medication and was admitted to CSU.  (Id.)  On May 8, 2018, Plaintiff claimed he wanted to die, threatened to kill himself, and was admitted to CSU.  (Id.)

On April 26, 2018, Officer Martin wrote an entry in the logbook indicating Plaintiff wanted to commit suicide and contacted mental health personnel.  (Doc. no. 35, p. 1.)  The mental health department stated Plaintiff's mental health counselor would meet with Plaintiff, but the counselor did not come to Plaintiff's dorm and Plaintiff did not receive any assistance.  (Id. at 1-2.)

Plaintiff is housed in dorm 12B2 and cannot participate in mental heath services, which take place from 7:30 a.m. to 9:00 a.m. Mondays through Thursdays, because of his housing assignment.  (Doc. no. 38, pp. 1-2.)  Plaintiff qualifies as a MH level three inmate, but Counselors Hamilton, Fisher, Richard, and Tate are "frauding [his] process" by telling Ms. Young Plaintiff is doing well.  (Doc. no. 39, p. 1.)  Furthermore, Ms. Young refuses to increase Plaintiff's MH level because he is suing her.  (Id. at 2.)  Plaintiff's current counselor

informed Plaintiff he refuses mental health treatment by not working a detail, but Plaintiff cleans the dorm and showers. (Id.)

Additionally, Plaintiff filed declarations by Joseph Parker and Dwight Massey, in which they indicate they saw Plaintiff hang himself on December 9, 2019 at ASMP and have heard Plaintiff saw he is going to kill himself or get someone to kill him.  (Doc. no. 46, pp. 3-4.)

**B.     Defendants' Declarations**

At all times relevant to the lawsuit, Ms. Young has been the Mental Health Unit Director at ASMP, which is an administrative and supervisory role.  (Young Decl., doc. no. 57-4, ¶ 3.)  Ms. Young is responsible for supervising clinical mental health providers at ASMP.  (Id. ¶ 6.)  Ms. Young is aware of the status of inmates designated for mental health services and their placement at ASMP but is not licensed to make a diagnosis, determine treatment, or make a designation of MH level.  (Id.)

On July 27, 2016, Plaintiff's MH level was changed from three to two based on a determination by his mental health treatment team, including his assigned mental health counselors and psychiatrist.  (Id. ¶ 8.)  Plaintiff's mental health counselor, Jowanda Fishmon, saw Plaintiff on May 9 and June 8, 2017, and Plaintiff's assigned psychologist, Dr. Brian Slutzky, saw Plaintiff on May 19, 2017.  (Id.)  Both noted Plaintiff's endorsement of suicidal ideation and denial of any plan or intent and reaffirmed Plaintiff's status as a MH level two inmate.

Ms. Young is not responsible for Plaintiff's mental health classification or treatment,

did not provide clinical services to Plaintiff, and does not independently diagnose or assign an inmate's mental health classification level.  (Id. ¶¶ 11-12.)  While Ms. Young is generally aware of an inmate's placement in CSU as the mental health unit director, she does not make the decision to place an inmate in that unit for treatment.  (Id. ¶ 13.)  Plaintiff continues on the mental health case load and is under a current treatment plan with counselor Jennifer Tate, psychologist Patrick Williams, and psychiatrist Nancy Harpold.  (Id. ¶ 14.)

Ms. Hamilton is a licensed mental health counselor with a Master's Degree in Social Work and, in August 2018, became a Licensed Clinical Social Worker.  (Hamilton Decl., doc. no. 57-5, ¶ 3.)  At all times relevant to the lawsuit, Ms. Hamilton was assigned to provide mental health counseling at ASMP and was responsible for the mental health counseling of inmates on her treatment case load.  (Id. ¶¶ 4, 6.)

Ms. Hamilton provided Plaintiff with mental health care and treatment during his incarceration at ASMP and participated in his semi-annual review on July 18, 2016, under the supervision of psychologist Dr. Patrick Williams.  (Id. ¶ 7.)  Because Plaintiff was able to use positive coping skills to remain stable and denied the need for placement in the Supporting Living Unit ("SLU"), a change in Plaintiff's level of care from MH level three to level two was recommended.  (Id.)  Since July 27, 2016, Plaintiff has not been on Ms. Hamilton's caseload and she has not assessed him as a mental health counselor.  (Id. ¶ 8.)  Plaintiff's classification has remained MH level two since 2016, indicating improvement in his mental health status.  (Id.)

Plaintiff's clinical presentation met the criteria for a MJ level two designation, and her

assessments made under the supervision of a licensed psychologist support this diagnosis. (Id. ¶ 10.) Ms. Hamilton was not deliberately indifferent to Plaintiff's mental health needs and has not denied him necessary care and treatment. (Id.)

### C.   Plaintiff's Relevant Grievance History

Plaintiff filed twenty grievances since being admitted to ASMP on December 17, 2014, six of which relate to mental health issues. (Doc. no. 1; SMF, Colon Decl., doc. no. 57-3, ¶ 22.) Of these grievances, only four predate Plaintiff's July 17, 2017 complaint.

On December 15, 2015, Plaintiff filed grievance number 210353, in which he complained he is supposed to see his mental health counselor twice per month but has only seen her once. (Doc. no. 57-3, p. 23.) Plaintiff stated the mental health counselor only came on Fridays and has not seen Plaintiff on those occasions. (Id.) Finally, Plaintiff states he needed indigent supplies, and the counselor told him to write the chaplain with his request. (Id.) Plaintiff dropped this grievance prior to resolution. (Id.)

On December 21, 2015, Plaintiff filed grievance number 210373 requesting copies of his mental health records for the purpose of a lawsuit. (Colon Decl., ¶ 23; doc. no. 57-3, pp. 22-23.) The grievance was denied because Plaintiff must submit a written request for copies of his records, and Plaintiff did not appeal the denial. (Id.) On November 7, 2016, Plaintiff filed grievance number 232390, in which he complained he wanted to kill himself, stated he would continue trying until he succeeded, and requested his inmate status change from MH level two to level three. (Colon Decl., ¶ 24; doc. no. 57-3, p. 19.) The grievance was denied and Plaintiff appealed. (Id.) The appeal was forwarded to health services clinical staff and

denied in part.  (Id.)

On July 5, 2017, Plaintiff filed grievance number 246513, in which he alleged the following:  (1) on June 27, 2017, Plaintiff informed his mental health team he wanted to kill himself and would attempt to do so as long as he has a life sentence; (2) Plaintiff also informed Ms. Young in a letter he would kill himself, but his complaint was ignored; and (3) Plaintiff stated he tried to kill himself two weeks before by overdosing.  (Colon Decl., ¶ 8; doc. no. 57-3, p. 15.)  Ms. Young stated in a staff comment to the grievance Plaintiff indicated during the June 29, 2017 staff meeting he had no plan or intent regarding his suicidal ideations, so suicidal precautions were not warranted.  (Doc. no. 57-3, p. 15.)  The grievance was denied, noting Plaintiff is appropriately housed and receiving proper mental health care.  (Id.)  Plaintiff did not appeal the denial.  (Colon Decl., ¶ 8.)

**D.      Plaintiff's Mental Health Records**

**1.      Comprehensive Treatment Plans**

The December 24, 2014 comprehensive treatment plan states Plaintiff had been a MH level three inmate since July 16, 2014.  (Doc. no. 67-3, pp. 152-54.)  The plan indicated standard security precautions and universal health care were sufficient for Plaintiff and he would be considered for discharge when he could function on a day to day basis without psychotropic medication for at least sixty days and symptoms did not impede daily demands of self care.  (Id. at 152.)  Plaintiff was to receive individual counseling twice monthly and monitored every sixty days for medication management.  (Id. at 153.)  The June 26, 2015 comprehensive treatment plan review indicated Plaintiff should remain a MH level three

inmate due to his need for mental health medication and history or abuse, worry, hopelessness, and depression. (<u>Id.</u> at 150-51.)

The December 21, 2015 comprehensive treatment plan and June 21, 2016 review indicated Plaintiff should remain at MH level three because he continued to experience symptoms related to his depressive disorder and required medication management. (<u>Id.</u> at 141-46.)   However, on July 19, 2016, the treatment plan was revised to recommend Plaintiff's status be changed to MH level two. (<u>Id.</u> at 143, 151.)   The justification for the change was Plaintiff remained stable and denied the need for placement in the SLU due to the use of positive coping skills. (<u>Id.</u> at 151.)

The December 29, 2016 comprehensive treatment plan recommended Plaintiff remain at MH level two due to symptoms of depression accompanied by suicidal ideations and paranoia.   (<u>Id.</u> at 138.)   The plan stated Plaintiff experienced depression and suicidal ideations six days a week, would not be on suicide precaution status during the reporting period, and would see the mental health counselor once per month to cope with symptoms of depression and suicidal ideations. (<u>Id.</u> at 139.)

The June 29, 2017 comprehensive treatment plan review recommended Plaintiff's MH level increase to three due to experiencing symptoms of depression, requiring psychotropic medications, and suicidal ideations. (<u>Id.</u> at 137.)   The review stated Plaintiff denied having a plan to kill himself but "constantly" requested his MH level be increased to three. (<u>Id.</u>)   Nevertheless, Plaintiff did not meet the criteria for suicide prevention and his last CSU admission was August 30, 2016. (<u>Id.</u>)

Plaintiff's next comprehensive treatment plan is dated May 2, 2018, and indicated Plaintiff's MH level was not raised to three after the June 29th review.  (Id. at 130-31, 136.) The May 2nd plan stated Plaintiff's MH level should remain two because he continued to report symptoms of his disorders.  (Id. at 130.)  Plaintiff was scheduled to meet with his mental health counselor once per month to help him cope with suicidal ideations.  (Id. at 131.)

### 2.        Suicide Precaution Treatment Plans

On January 12, 2015, Plaintiff was classified as a level one Suicide Precaution ("SP") inmate after cutting his arm.  (Id. at 149.)  As a result, Plaintiff began to receive individual counseling from his mental health counselor twice per week.  (Id.)  Plaintiff was discharged from SP status on September 17, 2015, because he had no current suicidal intent or plans, but he continued to receive individual counseling twice per month .  (Id. at 149, 174.)

On August 30, 2016, Plaintiff was placed at SP level two following an attempted overdose based on his change from MH level three to level two, life sentence, previous suicide attempts in confinement, and availability of means and opportunity.  (Id. at 170-72.) While a SP level two inmate, Plaintiff was placed in a suicide precaution cell, received checks every fifteen minutes, was given only a smock, mattress, and blanket, and received daily monitoring by the CSU treatment team.  (Id. at 147, 172.)  On August 2, 2016, Plaintiff was decreased to SP level one based on improvements regarding suicidal ideation, depression, anxiety, and self-injurious behavior.  (Id. at 169.)  On August 16, 2016, a short-term step-down from SP level one was recommended based on continued improvements.

(Id. at 168.)  Finally, Plaintiff was discharged from suicide precaution status on October 21, 2016, and continued to be seen by his mental health counselor twice per month.  (Id. at 167.)

On July 17, 2017, Plaintiff underwent an assessment for suicide risk based on his suicidal ideations, but Dr. Williams determined Plaintiff was only at a mild risk level because he was a multiple attempter with no other risk factors.  (Id. at 164-66.)  On July 26, 2017, Plaintiff underwent a second assessment based on his claim he swallowed twenty psychotropic pills.  (Id. at 161-62.)  Plaintiff was placed at SP level one and his therapeutic contacts were increased to twice a week.  (Id. at 163.)  On August 12, 2017, Plaintiff was transferred from general population to CSU after attempting to hang himself.  (Doc. no. 160.) On August 15, 2017, Plaintiff's SP level was reduced from two to one and, on October 3, 2017, he was discharged from SP status and returned to MH level two services based on his lack of suicidal ideation and plans.  (Id. at 159.)

On May 11, 2018, Plaintiff's SP level was reduced from two to one, and, on June 19, 2018, Plaintiff was discharged from SP status and returned to routine MH level two status. (Id. at 7.)

### 3.   Mental Health Progress Notes

Plaintiff received between one and nine individual counseling and therapy sessions per month at ASMP between August 2018 and November 2015.  (See generally id. at 1-123.) Between July 19, 2016 – when Plaintiff became a MH level two inmate – and August 5, 2018, Plaintiff received approximately sixty-five individual counseling sessions and medication follow-up appointments.  (Id. at 3-81.)  Plaintiff also underwent several

evaluations regarding suicide precaution during this period.  (Id. at 7, 8, 14, 22, 39, 42, 46, 62.)

### a.     2015 and 2016

On November 4, 2016, Plaintiff denied suicidal ideations and any other issues related to his depression.  (Id. at 123.)  On November 16, 2015, Plaintiff denied symptoms related to his depressive disorder and chronic passive suicidal ideations.  (Id. at 122.)  Plaintiff was absent for three of four puzzles and games group therapy sessions in November 2015.  (Id. at 121.)  In December 2015, Plaintiff was absent for all conversation group therapy sessions, all puzzles and games group therapy session, and three of four current events group therapy sessions.  (Id. at 117-19.)

On January 5 and January 14, 2016, Plaintiff denied symptoms of chronic passive suicidal ideation and depressed mood.  (Id. at 115-16.)  In January 2016 Plaintiff missed three of four of his conversation and puzzles and games group therapy sessions and all of his stress management group therapy sessions.  (Id. at 111, 113-14.)  On February 11 and February 23, 2016, Plaintiff denied target symptoms and active thoughts of suicidal ideations.  (Id. at 110, 112.)

On March 18, 2016, Plaintiff reported he did not want to participate in GDC programming but wanted to continued individual sessions with the mental health counselor.  (Id. at 109.)  On March 24, 2016, Plaintiff requested an individual discussion concerning his struggles with depression.  (Id. at 108.)  On March 28, 2016, Plaintiff reported depression related to his prison sentence.  (Id. at 107.)  Plaintiff attended all group therapy sessions in

March 2016.  (Id. at 106-07.)

On April 4, 2016, Plaintiff reported a desire for others to kill him because of his inability to accept his life sentence.  (Id. at 104.)  On April 8, 2016, Plaintiff's motion for a new trial was denied, but Plaintiff denied suicidal ideations and denied the need to be housed in CSU.  (Id. at 103.)  On April 11, 2016, Plaintiff reported depression based on his life sentence and limited family contact.  (Id. at 102.)  On April 15, 2016, Plaintiff reported wanting someone to kill him but assured the counselor he does not have a plan.  (Id. at 101.) On April 18, 2016, Plaintiff reported suicidal ideations but did not express any plans.  (Id. at 100.)  On April 22, 2016, Plaintiff did not report any issues.  (Id. at 99.)

On May 6, 2016, Plaintiff informed his then counselor, Ms. Hamilton, he tried to kill himself unsuccessfully nine times and is now attempting to provoke inmates into killing him. (Id. at 95.)  In May 2016, Plaintiff did not attend any depression group therapy sessions but attended all three puzzles and games group therapy sessions.  (Id. at 92-93.)  On June 6, 2016, Plaintiff expressed a need to improve coping skills to decrease depressed mood and chronic passive suicidal ideations.  (Id. at 91.)  On June 20, 2016, Ms. Hamilton reported Plaintiff presented no psychosocial concerns, and Plaintiff expressed belief a dorm change would help him decrease passive suicidal ideations.  (Id. at 89.)  In June 2016, Plaintiff did not attend three of four depression group therapy sessions and did not participate when present. (Id. at 90.)

On July 11, 2016, Ms. Hamilton discussed level reduction with Plaintiff due to his desire to increase out of dorm activities to reduce depression.  (Id. at 86.)  Based on

Plaintiff's demonstrated ability to engage in prosocial activities, the treatment team determined Plaintiff would benefit from a less-restrictive environment and planned to reduce Plaintiff's MH level from three to two.  (<u>Id.</u>)  On July 15, 2016, Plaintiff presented no suicidal intent, serious depression, or self-injurious thoughts.  (<u>Id.</u> at 85.)

On July 28, 2016, Plaintiff was placed in isolation because he refused housing and, on August 2, 2016, stated he could not live in an open dorm.  (<u>Id.</u> at 83.)  However, Plaintiff reported no depression or suicidal intent.  (<u>Id.</u>)  Plaintiff was monitored every forty-eight hours.  (<u>Id.</u>)  On August 10, 2016, Plaintiff reported depression from being in lockdown.  (<u>Id.</u> at 81.)

On August 26, 2016, Plaintiff indicated he did not like dorm 12B2, where he was moved after becoming a MH level two inmate.  (<u>Id.</u> at 80.)  However, Plaintiff denied suicidal plans or intent.  (<u>Id.</u>)  On September 6, 2016, Plaintiff denied intent to harm himself after being released from CSU to dorm 12B2 on August 2, 2016, after alleging an overdose.  (<u>Id.</u> at 78.)  Plaintiff denied having problems since being discharged from CSU and continued on SP level one status.  (<u>Id.</u>)  On September 9, 2016, Plaintiff indicated he could not serve a life sentence.  (<u>Id.</u> at 77.)  On September 12, 2016, Plaintiff stated he did not want to be in dorm 12B2 but denied suicidal intent, and the counselor recommended SP level one services be discontinued.  (<u>Id.</u> at 76.)  On September 15, 2016, Plaintiff acknowledged suicidal ideations but denied intent to engage in self-injurious behavior.  (<u>Id.</u> at 75.)  On September 22, 2016, Plaintiff was seen after taking a Seroquel pill, and indicated he needed to be a MH level three inmate because he did not have friends at MH level two.  (<u>Id.</u> at 72.)

13

Plaintiff's counselor recommended SP level one services continue.  (Id.)

During his September 26, September 29, October 4, and October 6, 2016 sessions, Plaintiff voiced no complaints.  (Id. at 66-67, 69-70.)  On October 12, 2016, Plaintiff again said he wanted to be a MH level three inmate and attempted to speak to another prison official when he was denied.  (Id. at 65.)  On October 14, 2016, Plaintiff stated he wanted to die and did not want to be a MH level two inmate.  (Id. at 64.)  The counselor noted Plaintiff had not actually engaged in self-harm.  (Id.)  On October 21, 2016, was "smiling and was in good spirits," and the counselor recommended Plaintiff be referred for discharge from SP level one because he was no longer at imminent risk of self-harm.  (Id. at 63.)  Plaintiff was discharged from SP level one status that day.  (Id.)

On November 17, 2016, Plaintiff reported he would sometimes rather be dead than remain at his current level and was depressed all the time.  (Id. at 60.) The counselor noted it appeared Plaintiff was trying to convince him to increase his MH level.  (Id.)  On December 22, 2016, Plaintiff stated he had thoughts about killing himself because of his life sentence and needed to be back at MH level three so he could have at least two counseling sessions per month.  (Id. at 59.)

**b.    2017**

On January 17, 2017, Plaintiff reported attempting to kill himself by taking twelve Seroquel but it just made him sleep.  (Id. at 58.)  Plaintiff reported he was constantly depressed and believed he would be able to accept his life sentence if he was a MH level three inmate and could attend active therapy groups.  (Id.)  The mental health counselor

14

recommended Plaintiff be changed to MH level three but was assigned to SP level one and the stress management group instead, as recommended by the mental health director.  (Id.) On February 8, 2017, Plaintiff reported chronic self-injurious thoughts but no suicidal intent. (Id. at 57.)

On February 16, 2017, Plaintiff stated he wanted to be MH level three to attend group sessions and would attend any groups he was assigned to.  (Id. at 56.)  Plaintiff was assigned to three mental health groups.  (Id.)  On March 8, 2017, Plaintiff reported he was doing well even though the facilitators for his groups had not had many sessions.  (Id. at 55.)  On April 17, 2017, Plaintiff reported there were no groups on his schedule, he was constantly depressed, and wanted to die.  (Id. at 54.)  However, Plaintiff reported he did not have suicidal ideations and got along with the inmates in his dorm.  (Id.)  On May 9, 2019, Plaintiff stated he wanted to be moved to an open dorm and wanted to kill himself over the weekend.  (Id. at 53.)  On May 19, 2017, Plaintiff did not report suicidal ideations or thoughts of death.  (Id. at 52.)

On June 8, 2017, Plaintiff reported thinking of more ways to kill himself but requested to be assigned MH level three because there is more programming.  (Id. at 51.)  On July 10, 2017, Plaintiff was moved to dorm 12B after reporting he would fight the CERT officers if forced to return to his current dorm.  (Id. at 50.)  On July 13, 2017, Plaintiff stated he had suicidal ideations daily but no plan or intent to act on them.  (Id. at 49.)  Plaintiff reported he did not want to go to CSU, and the counselor noted Plaintiff did not use coping strategies or engage in activities.  (Id.)  On July 17, 2017, Dr. Williams performed a suicide

precaution evaluation based on Plaintiff's reported suicidal ideations but determined Plaintiff would not be placed at SP level one or two at that time.  (Id. at 46.)  On July 18, 2017, Plaintiff reported he did not want to kill himself but would not care if someone else killed him.  (Id. at 45.)

On July 26, 2017, the counselor was called after Plaintiff actively solicited someone to kill him in his dorm, but Plaintiff denied suicidal thoughts.  (Id. at 44.)  Plaintiff was placed on SP level one protective status.  (Id.)  On July 31, 2017, Plaintiff reported he was doing well and would not ask anyone to kill him.  (Id. at 41.)  Plaintiff was continued on SP one status.  (Id.)  On August 4, 2017, reported he was doing well, indicated he felt depressed because he had not heard from his wife, and requested to be at MH level three status.  (Id. at 40.)

On August 5, 2017, Plaintiff threatened to take several pills to kill himself and reported stress about his sentence and current mental health level.  (Id. at 39.)  The counselor provided several coping strategies to Plaintiff, and Plaintiff remained at SP level one.  (Id.) On August 8, 2017, Plaintiff reported previous suicidal thoughts but denied a current plan or intent to act on his suicidal threats.  (Id. at 38.)  Plaintiff expressed desire to be a MH level three inmate to have access to more treatment groups and programs.  (Id.)  On August 11, 2017, Plaintiff admitted his behavior the past weekend had been for attention.  (Id. at 36.) Plaintiff reported ongoing thoughts of suicide without a current plan or intent to act.  (Id.)

On August 24, 2017, Plaintiff acknowledged fleeting and passive thoughts of suicide without a current plan or intent.  (Id. at 34.)  On August 28, 2017, Plaintiff denied thoughts

of suicide but described depression due to his wife not loving him.  (Id. at 33.)   On September 1, 2017, Plaintiff stated he was depressed and suicidal the previous day but was able to overcome those feelings, which he had difficulty doing in the past, by taking his medication and resting.  (Id.)  On September 5, 2017, Plaintiff reported feeling depressed the prior weekend because his wife was with her boyfriend but indicated he used materials provided by the counselor to consider his feelings.  (Id. at 31.)

On September 8, 2017, Plaintiff stated he was depressed and thinking of cutting his throat but had been unable to obtain means to do so.  (Id.)  On September 14, 2017, Plaintiff admitted he thought about hanging himself earlier in the week because he could not see his wife but denied current plans or intent to harm himself.  (Id. at 29.)  Plaintiff attempted to cope with his feelings by walking around and exercising in his dorm.  (Id.)  On September 15, 2017, Plaintiff reported he would rather be dead than serve a life sentence but denied current plans to kill himself.  (Id. at 28.)   On September 18, 2017, Plaintiff reported depression because his wife did not come see him the past weekend.  (Id. at 27.)

On September 22, 2017, Plaintiff reported endorsing thoughts of suicide but lacked the means to harm himself.  (Id. at 26.)  On September 25, 2017, Plaintiff maintained his innocence regarding his convictions and expressed frustration at the lack of legal recourse available to him.  (Id. at 25.)  On September 29, 2017, Plaintiff stated he was less frustrated by other inmates' behavior and endorsed occasional thoughts of suicide but denied any plan or intent to harm himself.  (Id. at 24.)  On October 2, 2017, Plaintiff complained he still wanted someone to kill him but knew it would not happen.  (Id. at 23.)  However, Plaintiff

showed positive progress, and the counselor recommended Plaintiff's suicide precaution level decrease.  (Id.)  On October 3, 2017, Plaintiff was returned to routine MH level two services because he had no self-injurious behavior or plans for the past thirty days.  (Id. at 22.)

On November 22, 2017, Plaintiff reported he previously attempted to kill himself thirteen times by various means.  (Id. at 21.)  On December 8, 2017, Plaintiff threatened to take several unidentified pills, stating he could not take his life sentence anymore.  (Id. at 20.)  Plaintiff gave the pills to the counselor upon request, and the counselor encouraged Plaintiff to engage in positive thinking.  (Id.)  Plaintiff was admitted to CSU.  (Id.)

### c.    2018

On January 23, 2018, Plaintiff reported he wanted to die and believed he would die soon because he dreamed he was in hell.  (Id. at 19.)  On February 7, 2018, Plaintiff reported he was depressed every day and still wanted to kill himself but nobody would kill him.  (Id. at 18.)  The counselor recommended Plaintiff request a detail, but Plaintiff indicated he did not want to work.  (Id. at 18.)  On March 20, 2018, Plaintiff reported he wanted to kill himself, stated he wanted his MH level increased, and indicated he had filed a lawsuit.  (Id. at 17.)  Plaintiff reported he would be able to engage in activity groups and games if his level was increased.  (Id.)  The counselor encouraged Plaintiff to go to the gym, attend chapel services, and request a detail.  (Id. at 17.)  Again, Plaintiff stated he would not be a "slave" by working a detail.  (Id.)

On April 4, 2018, Plaintiff stated he wanted to die but denied plan or intent.  (Id. at

16.)  On May 8, 2018, Plaintiff threatened to consume a cup of pills.  (Id. at 13.)  Plaintiff stated he needed his MH level increased to three so he could engage in games and activities. (Id.)  Plaintiff gave the pills to a CERT Sergeant.  (Id.)  Plaintiff was placed on SP level two status and moved to CSU.  (Id. at 13-14.)  On May 11, 2018, Plaintiff was discharged from CSU, and, on May 14, 2018, Plaintiff denied suicidal ideations and endorsed a stable mood. (Id. at 14.)  On May 16, 2018, Plaintiff indicated he still wanted to kill himself but denied any plans.  (Id. at 12.)  Plaintiff requested his MH level increase and said he would only work in the laundry.  (Id.)  Plaintiff continued on SP level one precautions.  (Id.)  On May 31, 2018, Plaintiff reported he still wanted to kill himself.  (Id. at 11.)  On June 11, 2018, Plaintiff continued to report thoughts of suicide without a plan and refused to work a detail or engage in activities.  (Id. at 10.)  On June 15, 2018, Plaintiff reported he wanted to kill himself and remained on SP level one precautions.  (Id. at 9.)

On June 18, 2018, Plaintiff reported he wanted to kill himself and asked about a detail in the laundry department.  (Id. at 6.)  On July 9, 2018, Plaintiff manifested serious depression and chronic suicidal ideation but no associated intent or plan.  (Id. at 5.)  On July 13, 2018, the counselor informed Plaintiff he would be assigned a laundry detail if he wanted, but Plaintiff indicated he did not want a detail and would not work for free.  (Id. at 4.)  On July 26, 2018, Plaintiff reported he only wanted to die.  (Id. at 3.)  Finally, on August 6, 2018, Plaintiff reported suicidal thoughts and then failed to show up at his scheduled appointment.  (Id. at 2.)

19

## II.      DISCUSSION

### A.      Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party."  United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc).  On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial.  Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Id. at 608.  The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint.  Morris v. Ross,

20

663 F.2d 1032, 1034 (11th Cir. 1981).  Rather, the non-moving party must respond either by affidavits or as otherwise provided in Federal. Rule Civil Procedure 56.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (quoting Adickes, 398 U.S. at 158-59).  A genuine dispute as to a material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.

B.     **Factual Record**

Plaintiff did not file a statement of material facts with his motion for summary judgment, as required by Loc. R. 56.1, despite having been previously warned to do so by the Court.  (Doc. no. 17, p. 3.)  Plaintiff submitted nine declarations signed by him consisting of legal argument, policy guidelines, and allegations of deliberate indifference to his serious medical needs.  (See generally doc. nos. 17, 13, 14, 27, 34, 35, 38, 39, 54.)  Plaintiff also submitted declarations by inmates Joseph Parker and Dwight Massey.  (Doc. no. 46, pp. 3-4.)

Defendants submitted with their motion for summary judgment a Statement of Material Facts pursuant to Loc. R. 56.1.  (Doc. no. 57-2.)  Plaintiff's response to Defendants' summary judgment motions consists of approximately three pages of factual and legal argument without any opposing affidavits, (doc. no. 60),  to which he attached the following six exhibits:  (1) the June 29, 2018 comprehensive treatment plan review; (2) the December 29, 2017 comprehensive treatment plan; (3) a handwritten copy of SOP 508.16; (4) Dwight Massey's declaration; (5) one page of progress notes regarding his August 30, 2016 suicide attempt; and (6) treatment notes from his September 22, 2016 suicide attempt.  (Doc. no. 60-1.)

Because Plaintiff did not provide a statement of material facts directly refuting Defendants' statement of material facts, the Court deems admitted all portions of Defendants' Statement of Material Facts having evidentiary support in, and not otherwise contradicted by, the record. See Loc. R. 56.1; Fed. R. Civ. P. 56(e); see also Williams v. Slack, 438 F. App'x 848, 849-50 (11th Cir. 2011) (finding no error in deeming defendants' material facts admitted where *pro se* prisoner failed to respond with specific citations to evidence and otherwise failed to state valid objections); Scoggins v. Arrow Trucking Co., 92 F. Supp. 2d 1372, 1373 n.1 (S.D. Ga. 2000) (same).

However, Defendants, as movants, continue to "shoulder the initial burden of production in demonstrating the absence of any genuine issue of material fact." Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008); see also Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009). Thus, the Court will consider facts in the record outside of Defendants' statement of material facts, including the declarations filed by Plaintiff, to the extent they meet the requirements of Federal Rule of Civil Procedure 56, "to determine if there is, indeed, no genuine issue of material fact." Mann, 588 F.3d at 1303.

## C.    Plaintiff's Motion for Summary Judgment

Plaintiff's motion for summary judgment, which is little more than a recitation of his claims, consists of two pages of factual and legal argument and four pages of exhibits. (See doc. no. 55, 55-1.) Plaintiff's motion is procedurally improper because it fails to comply with the Local Rules. In contravention of Local Rule 56.1, there is no brief in support of the motion and no separate, short, and concise statement of the material facts – supported by

citation to the record – to which Plaintiff contends there is no genuine dispute to be tried. The Court previously warned Plaintiff of this requirement on at least one occasion. (Doc. no. 17, p. 2.) A motion may be summarily denied for failure to comply with the Court's Local Rules. Layfield v. Bill Heard Chevrolet Co., 607 F.2d 1097, 1099 (5th Cir. 1979)[1] (holding that failure to comply with the Local Rules may result in summary denial of motion).

Furthermore, as explained below, Defendants are entitled to summary judgment because there is no genuine issue of material fact as to whether Defendants were deliberately indifferent to Plaintiff's medical needs. For these reasons, Plaintiff's motion for summary judgment should be **DENIED**. (Doc. no. 55.)

>   **D.**   **Defendants are Entitled to Summary Judgment Because Defendants were not Deliberately Indifferent to Any Serious Medical Need**

>>   **1.**   **Deliberate Indifference Standard**

To prevail on a claim for deliberate indifference to a serious medical need, Plaintiff must prove that: (1) he had a serious medical need – the objective component, (2) a defendant acted with deliberate indifference to that need – the subjective component, and (3) his injury was caused by a defendant's wrongful conduct. Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007); see also Thomas v. Bryant, 614 F.3d 1288, 1317 n.29 (11th Cir. 2010).

To satisfy the objective component, a prisoner must allege that his medical need "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay

---

[1]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions that were handed down prior to the close of business on September 30, 1981.

person would easily recognize the necessity for a doctor's attention." Goebert, 510 F.3d at 1326 (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir.1994)). To satisfy the subjective component, Plaintiff must allege that a defendant (1) was subjectively aware of a serious risk of harm and (2) disregarded that risk (3) by following a course of action which constituted more than mere negligence. Melton v. Abston, 841 F.3d 1207, 1223 (11th Cir. 2016).

Furthermore, "not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003). The Eighth Amendment does not mandate that the medical care provided to the prisoner "be perfect, the best obtainable, or even very good." Harris v. Thigpen, 941 F.2d 1495, 1510 (11th Cir. 1991) (quoting Brown v. Beck, 481 F. Supp. 723, 726 (S.D. Ga. 1980) (Bowen, J.)). As the Supreme Court has explained:

> [A]n inadvertent failure to provide medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). Thus, mere allegations of negligence or malpractice do not amount to deliberate indifference. Campbell v. Sikes, 169 F.3d 1353, 1363-72 (11th Cir. 1999) (explaining that medical malpractice cannot form the basis for Eighth Amendment liability); Harris, 941 F.2d at 1505.

The Eleventh Circuit has consistently held that a mere difference of opinion between an inmate and prison medical officials over a diagnosis or course of treatment does not support a claim of deliberate indifference.  See Smith v. Fla. Dep't of Corr., 375 F. App'x 905, 910 (11th Cir. 2010).  That is, the burden of proving deliberate indifference cannot be met simply by arguing that an inmate wanted a different type of treatment.  Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985) ("Where a prisoner has received . . . medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments. . . .").  "The question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment."  Butler v. Prison Health Servs., Inc., 294 F. App'x 497, 499 (11th Cir. 2008) (citing Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995)).  Furthermore, the Court should not second-guess medical judgments.  Wallace v. Sheriff, 518 F. App'x 621, 622-23 (11th Cir. 2013); Smith, 375 F. App'x at 910 ("[W]hether governmental actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment.").

2. **Even Assuming Plaintiff Suffered a Serious Medical Need, He Fails to Establish Defendants Were Deliberately Indifferent to His Medical Needs**

Even if Plaintiff's depression and suicidal ideations constitute a serious medical need, no reasonable juror could find Defendants were deliberately indifferent because Plaintiff's

treatment was constitutionally adequate and Plaintiff alleges, at most, a mere difference of opinion as to the proper course of treatment for his mental illnesses.

Plaintiff argues he did not receive adequate treatment as a MH level two inmate.  As described in detail in § I.D, *supra*, Plaintiff received regular individual therapy sessions both before and after his MH level was changed from three to two.  (See doc. no. 67-3, pp. 2-123.) Plaintiff's medications were routinely reviewed and modified based on his needs.  (Id. at 5, 16, 37, 52, 57, 61, 80, 85, 96, 110.)   Furthermore, any time Plaintiff attempted to harm himself or reported an intent to do so, he was evaluated for SP status.  As a result, Plaintiff was admitted to CSU on no fewer than five occasions after being reassigned as a MH level two inmate when closer observation was deemed necessary.  Finally, ASMP staff regularly created and reviewed comprehensive treatment plans for Plaintiff's medical needs.  (Id. at 130-54.)  Thus, by no means does the medical treatment Plaintiff received as either a MH level three or two inmate constitute "an unnecessary and wanton infliction of pain" or appear "repugnant to the conscience of mankind."  Estelle, 429 U.S. at 105-06.

Furthermore, Plaintiff's grounds for contending he should be a MH level three inmate are contradicted by the record.  Plaintiff's primary complaint about being a MH level two inmate was the lack of sufficient opportunities for group sessions.  (Id. at 13, 38, 51, 56, 58.) After complaining about the lack of group therapy sessions on February 16, 2017, Plaintiff was assigned to three therapy groups.  (Id. at 56.)  However, Plaintiff still refused to take advantage of recreational activities available at level two.  (Id. at 3, 10, 12, 20.)  Moreover, as a MH level three inmate, Plaintiff failed to attend the majority of his assigned group

therapy sessions, (id. at 90, 92-93, 106-07, 111, 113-14, 117-119, 121), and, on March 18, 2016, stated he did not want to participate in programming except individual therapy sessions with a mental health counselor,  (id. at 109).  Finally, on July 11, 2016, Plaintiff reported to Ms. Hamilton a desire to increase activities outside the dorm to reduce symptoms of depression.  (Id. at 86.)  Plaintiff's reported desire was consistent with the treatment team's determination Plaintiff would benefit from the less-restrictive environment available at MH level two.  (Id.)  Thus, Plaintiff's basis for wanting to return to MH level three is inconsistent with his own statements and his performance when actually enrolled in such groups.

Plaintiff argues he qualified to be a MH level three patient under the GDC Mental Health Services SOP effective during the relevant period.  SOP 508.16 (VG32-0001), which (1) describes the mental health program services available to inmates and (2) states the need for MH level two services is indicated when an inmate's ability to function in general population is mildly impaired due to mental illness or the inmate needs monitoring due to either recent discharge from a supporting living unit ("SLU") or CSU or a recent history of self-injurious behavior or suicidal ideation.  (Doc. no. 67-1, pp. 3-4.)  MH level three services are appropriate when the inmate's ability to function is moderately impaired and reflects a "tenuous mental status that is easily overwhelmed by everyday pressures, demands, and frustrations resulting in the following: disorganization, impulsive behavior, poor judgment, a deterioration of emotional controls, loosening of associations, delusional thinking, and/or hallucinations."  (Id. at 6.)  One admission criteria for MH level three services is a serious mental illness resulting in significant impairment in the inmate's ability

27

to adjust and function satisfactorily within the general prison population, as determined by the number, intensity, and frequency of mental health services needed.  (Id. at 7.)  Admission is also contingent on the inmate being recommended for SLU placement by the mental health treatment team.  (Id. at 8.)

From May 2018 through August 2018, Plaintiff's treatment notes indicate his judgment was regularly average or below average and his thought processes and content were illogical or incoherent.  (Doc. no. 67-3, pp. 3-4, 6, 9-13.)  However, prior to May 2018, Plaintiff's thought processes and content were consistently logical, coherent, and relevant and his judgment fluctuated between average and poor.  (Id. at 14-123.)  Except for his chronic passive suicidal ideations and occasional suicide attempts, Plaintiff's treatment notes do not indicate Plaintiff was unable to adjust and function satisfactorily within the general prison population after being reassigned as a MH level two inmate.  Indeed, Plaintiff regularly reported suicidal ideations as a MH level three inmate and described nine prior suicide attempts during that period.  (Id. at 99, 101, 104.)  Thus, there is no indication Plaintiff's continued suicidal ideations and attempts as a MH level two inmate would have been prevented by his being a MH level three inmate, as his behavior in general population was consistent with his behavior in SLU.  Because there was no significant impairment in Plaintiff's ability to adjust and function satisfactorily within the general prison population, Plaintiff did not meet the criteria for MH level three.

Furthermore, the treatment team determined Plaintiff should not be recommended for SLU housing.  This determination was made with full awareness of Plaintiff's chronic

passive suicidal ideations, depressed mood, and occasional suicide attempts.  (Id. at 86, 89, 130-138.)  Indeed, Plaintiff regularly communicated a direct connection between his suicidal ideations and his desire to be a MH level three inmate, and, as of the May 2, 2018 comprehensive treatment plan, the treatment team determined it was appropriate for Plaintiff to remain a MH level two inmate.  (Id. at 12, 13, 17, 130-131.)  In sum, Plaintiff's argument he was qualified to receive MH level three services is, at best, a mere difference of opinion between an inmate and prison medical officials over his course of treatment.

Finally, Plaintiff cites several non-binding cases to support his argument Defendants were deliberately indifferent to his risk of suicide by failing to provide MH level three services.[2]  As described below, these cases are distinguishable and do not undermine the Court's analysis.

First, in Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 257-59 (7th Cir. 1996), Plaintiffs argued prison officials knew Cole, a pretrial detainee, was a suicide risk, had plastic bags accessible to him which posed a serious risk of harm, failed to remove the bags, and failed to transfer Cole from the psychiatric unit or increase his monitoring.  The Seventh Circuit held summary judgment for the defendants was appropriate because  (1) allegations of medical malpractice are insufficient to sustain a § 1983 action; (2) mere differences of opinion regarding appropriate treatment do not give rise to deliberate indifference; and (3) Plaintiffs did not establish a "substantial departure from accepted professional judgment," as

---

[2]Plaintiff also cites case law in support of his argument a serious risk of suicide constitutes a serious medical need.  However, because the Court assumes for the purpose of its decision Plaintiff suffered a serious medical need based on his depression and suicidal ideations, analysis of those cases is not relevant here.

required to hold Defendants liable. Id. at 259-63. Similarly, Plaintiff's complaints amount to nothing more than a difference of opinion between Plaintiff and his treating providers about his appropriate MH level. Moreover, Plaintiff has submitted nothing to suggest the determination to assign Plaintiff MH level two status was a substantial departure from accepted professional judgment.

Second, in Gregoire v. Class, 236 F.3d 416 (8th Cir. 2000), the court determined a defendant was entitled to qualified immunity as to the plaintiff's deliberate indifference claim. The defendant was only aware of the risk of suicide based on a single phone call and was not aware of the inmate's past treatment for depression and assignment to suicide watch. Id. at 416-18. Based on the information available to him, the defendant was not deliberately indifferent when he called prison officials to warn them about the suicide risk, write a brief report, and review the inmate's file prior to paging the inmate to his office. Id. at 418-19. The court held qualified immunity was appropriate because the defendant could reasonably believe his response to the risk was not deliberately indifferent or reckless to the risk. Id.

More so than in Gregoire, Plaintiff's medical records show the treatment team was fully aware of Plaintiff's past depression, suicidal ideations, and suicide attempts when determining his MH level. As discussed above, the treatment provided to Plaintiff does not indicate Defendants or ASMP staff were deliberately indifferent to Plaintiff's medical needs. Indeed, Plaintiff's condition was constantly monitored by the mental health staff and modified when deemed appropriate.

Third, in Casey v. Lewis, 834 F. Supp. 1477, 1547-49 (D. Ariz. 1993), inmates

challenged the mental health care system available at the prison on the following grounds: (1) lack of a psychiatric staff to evaluate inmates; (2) failure to transfer inmates to facilities with psychiatric treatment available; (3) understaffing; (4) little or no mental health programming; (5) unacceptable delays in assessment and treatment; (6) use of lockdown facilities for inmates with serious mental illnesses without providing timely mental health care; and (7) improper monitoring of prescriptions of psychotropic medication.    The conditions at issue in Casey are a far cry from Plaintiff's allegations and the medical treatment he receives at ASMP, as evidenced by his medical records.

Similarly, in Langley v. Coughlin, 709 F. Supp. 482, 483-85 (S.D.N.Y. 1989), defendants acknowledged more than four hundred incident reports of mentally disordered inmates engaging in acts of self-destruction, arson, and assaultive behavior, including spreading feces and urine throughout the unit, flooding the unit with sewerage, and yelling and screaming day and night.   Furthermore, the defendants also acknowledged their practices and procedures for dealing with the incidents were inadequate.   Id.   The court determined defendants were not entitled to summary judgment as to the deliberate indifference claims by both the inmates receiving mental health treatment and those who were not.   Id. at 485. Again, Plaintiff's allegations pale in comparison with those in Langley, such that the court's decision there has no bearing on the Court's analysis here.

In Partridge v. Two Unknown Police Officers of the City of Houston, Tex., 791 F.2d 1182, 1183-84 (5th Cir. 1986), a pretrial inmate with past mental health issues killed himself after being placed in solitary confinement.   The court determined dismissal of the complaint

was not appropriate where the plaintiffs alleged a custom of inadequate monitoring of suicidal detainees, which amounted to a policy of denying medical care.  (Id. at 1188-89.) However, Partridge is not similar to Plaintiff's claim, which contains no allegation of a custom or policy by Defendants or ASMP mental health staff of failing to provide mental health inmates with proper treatment.

Citing Reed v. McBride, 178 F.3d 849, 855 (7th Cir. 1999), Plaintiff argues acknowledging a problem and merely saying "duly noted" is insufficient to defend against a deliberate indifference claim.  (Doc. no. 35, pp. 1-2.)  However, that is not what happened here.  Plaintiff's MH counselors and the rest of his treatment team carefully monitored Plaintiff's condition, recommended strategies for dealing with his depression and suicidal ideations, and imposed additional precautions, such as placing Plaintiff on SP status, when necessary.

Finally, Tlamka v. Serrell, 244 F.3d 628 (8th Cir. 2001) and Pavlick v. Mifflin, 90 F.3d 205 (7th Cir. 1996) are factually inapposite.  Tlamka concerns allegations of prison officials failing to provide CPR to an inmate having a heart attack, and, in Pavlick, the plaintiff alleges officials opened his cell door and allowed inmates to attack plaintiff in his cell.  In sum, none of the cases cited by Plaintiff undermine the Court's analysis as to the adequacy of treatment he received at ASMP.

Accordingly, no reasonable juror could find Defendants were deliberately indifferent based on him being assigned to MH level two at ASMP, and, thus, Defendants are entitled to summary judgment.  Thus, in light of the above, the Court need not address Defendants'

32

arguments regarding whether Plaintiff exhausted his administrative remedies prior to filing suit.

   **E.      Plaintiff's Motion for Judgment on the Pleadings**

   On March 21, 2019, Plaintiff filed a "motion for judgment on the pleadings," in which he asked the Court to rule on Defendants' motion for summary judgment.  (Doc. no. 55.)  Because the Court recommends herein Defendants' motion for summary judgment be granted, Plaintiff's motion should be **DENIED AS MOOT**.  (Id.)

**III.     CONCLUSION**

   For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** Plaintiff's motion for summary judgment be **DENIED**, (doc. no. 55), his motion for judgment on the pleadings be **DENIED AS MOOT**, (doc. no. 64), Defendants' motion for summary judgment be **GRANTED**, (doc. no. 57), a final judgment be **ENTERED** in favor of Defendants, and this civil action be **CLOSED**.

   SO REPORTED and RECOMMENDED this 11th day of July, 2019, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA